IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CRIM. ACT. NO. 1:24-cr-112-TFM |
| | ) | |
| ECHANDZA DIANCA MAXIE | ) | |

## MEMORANDUM OPINION

Defendant Echandza Dianca Maxie ("Maxie")[1] filed her motions to suppress (Docs. 267, 661).[2]  Based on the evidence presented to the Court, arguments of the parties, and for the reasons set forth herein, the Court orally denied the motions (Docs. 292, 731) and indicated a written opinion would follow.  This is that opinion.  For the reasons discussed below, the motions to suppress remain **DENIED**.

### I.   BACKGROUND[3] AND MOTION

On June 27, 2024, the Grand Jury returned an indictment against Maxie, her husband Glennie McGee, and several others with participating in a years-long drug conspiracy and related conduct.  Specifically, the indictment charged Maxie with Conspiracy to Possess with Intent to Distribute Cocaine under 21 U.S.C. § 846 (Count Two), Tampering with Evidence under 18 U.S.C.

---

[1] There are two other conspirators with the last name Maxie – both are Echandza Maxie's sister. One is charged in the drug conspiracy case (Exavieria) while the other is charged in the financial fraud case (Edezann).  However, for the purposes of this opinion, when the Court says "Maxie", it references Defendant Echandza Maxie.

[2] The motion (Doc. 661) was filed in both cases involving Echandza Maxie are identical and contain a consolidated header.  While the analysis would apply equally in both cases, Defendant Maxie pled guilty in the second case, Crim. Act. No. 1:24-cr-113-TFM (S.D. Ala.) and therefore the opinion became unnecessary.  Therefore, for the purposes of this opinion, the Court will only cite to the earlier case, *United States v. McGee*, Crim. Act. No. 1:24-cr-112-TFM (S.D. Ala.).

[3] The Court also adopts and incorporates by reference the background and facts articulated in the Memorandum Opinion issued as to the motions to suppress filed by co-Defendant Glennie McGee. *See* Doc. 1114.

§ 1512(c)(1) (Count Eleven), Disposal of a Firearm to a Prohibited Person (Felon) under 18 U.S.C. § 922(d)(1) (Count Twelve), and noted the applicability of forfeitures.  *See* Doc. 7.  On that same date, the Grand Jury returned a separate indictment for Maxie, McGee, and others for a years-long-conspiracy to commit fraud.  *See United States v. Maxie*, Crim. Act. No. 1:24-cr-113-TFM (S.D. Ala.).  Much of the discovery overlapped for both cases.

On September 25, 2024, the Grand Jury returned a superseding indictment charging Maxie, her husband McGee, Maxie's sister Exavieria, and others.  *See* Doc. 170.  With regard to Maxie, the Superseding Indictment added a Firearms Trafficking Conspiracy under 18 U.S.C. § 933(a)(3) (new Count Eleven[4]) but the charges otherwise remained the same as those presented in the original indictment. *Id*.

On October 14, 2025, Maxie filed her motion to suppress (Doc. 661).  In the motion to suppress, Maxie seeks to suppress the Title III wire conversations recorded by audio/visual recorders ("CCTV") which law enforcement put in her 2021 Cadillac Escalade.  While the title of the motion also references suppression of items obtained during the December 2022 search of her home, there is no portion of the written motion that relates to that search.[5]  Regardless, as the factual background of the search is relevant to the overall investigation, the Court still provides details on it here.

On December 21, 2022, agents executed the search warrant at the Raspberry Lane house.

---

[4] The previous Count Eleven remained in the Superseding Indictment but became Count Twelve. *See* Doc. 170 at 8-9.  Both Count Eleven and Count Twelve added her sister Exavieria as a co-Defendant.   The previous Count Twelve became Count Thirteen.

[5] To the extent Maxie does raise such a challenge, it fails for the same reasons articulated in the Court's Memorandum Opinion issued as to Defendant McGee's motion to suppress. *See* Doc. 1114.  Out of an abundance of caution, the Court notes that even if it were being challenged, the same analysis would apply to Maxie as to the search of the home at 2471 Raspberry Lane, Mobile Alabama.  The Court only discusses it here because the background is relevant to the later actions by law enforcement on seeking the Title III wire.

Neither McGee nor Maxie were present when the search began – though later Maxie arrived on the scene in a white Toyota Camry registered to McGee. Agents called McGee to inform him of the warrant and asked him to come to the scene to secure the minor children who were home and to speak with agents. McGee declined and never came to the scene during the search. While the agents executed the search warrant, Maxie arrived on the scene, and the agents saw in the backseat of the Camry a backpack with white residue lying next to a child's doll. The agents made a probable cause seizure of the backpack believing it to be cocaine residue which a forensic chemist later confirmed that the residue was in fact cocaine. In the safe of the master bedroom closet shared by McGee and Maxie, agents seized an AK-47 style Draco pistol, a magazine loaded with ammunition, and boxes of two types of ammunition. The keys to the safe were in the same closet and easily accessible to any resident. Though the weapons were discovered during the initial search, the agent sought and received that same day a follow up search warrant from the Magistrate Judge to encompass those items. Agents also found the foregrip for a pistol, bulk cash, a money counter, and evidence specific to the fraud scheme including a detailed ledger listing identifiers, identities of co-conspirators, and dollar amounts on fraudulent tax returns. Based upon the substantial evidence of fraud, the agents also seized numerous luxury items that appeared to be the fruits of either the fraud scheme, drug trafficking, or both.

When the agents were unable to seize McGee's cell phone at the December search, they applied for an additional warrant to seize the phone and to collect McGee's DNA. The warrant was approved on March 20, 2023. On March 29, 2023, the agents executed the warrant during a traffic stop after McGee left the Raspberry Lane residence in the same white Toyota Camry Maxie drove during the December 2022 search. Agents seized only one of the three phones in McGee's possession as the warrant included that particular phone and McGee declined consent related to

the other two phones.  During questioning, McGee lied about having access to the gun safe discovered during the prior search.  Agents extracted the contents of the cell phone which contained significant evidence of the fraud scheme, cocaine trafficking, and illegal possession of firearms.

On October 16, 2023, through counsel, McGee and Maxie filed a sealed Rule 41(g) motion for return of the property seized in the December 2022 search of the Raspberry Lane residence. The United States agreed to return certain property including cash, jewelry, purses, and clothing while retaining possession of the other items.  The United States did so to avoid prematurely revealing the full scope of the ongoing investigation – including the existence of a wiretap. However, the United States made clear that by returning it was in no way admitting the seizure was unlawful.  Therefore, the Rule 41(g) motion was denied as moot by the Magistrate Judge.  The items were returned on December 1, 2023.

The United States continued its investigation into McGee, Maxie, and the others as to both the fraud and drug trafficking.  In January 2024, agents obtained a recording of McGee discussing his drug enterprise including prices for bulk cocaine and fentanyl and his methods of laundering drug proceeds through real properties he owned.  On February 17, 2024, during a recorded meeting, McGee sold 1,000 fentanyl pills to a cooperating witness.  McGee was driving the 2021 Cadillac Escalade registered to Maxie during the transaction.

On March 8, 2024, United States District Judge Kristi DuBose authorized a Title III wiretap on two of McGee's cell phones.  The agents commenced interception of McGee's communications on March 12, 2024 which revealed further evidence of McGee's drug-trafficking activity.  As a result, on March 30, 2024, agents seized more than a kilogram of cocaine and a pistol from the vehicle of one of McGee's drug couriers (Tierra Hill – also charged in the indictment and

superseding indictment).  McGee learned of Hill's arrest when she texted him from her Apple Watch and he drove in the Cadillac Escalade past the scene of the stop.  Immediately afterwards, he began communicating with Maxie and several other co-conspirators which the agents intercepted via the wiretap.  During one call, McGee said the police were surrounding one of his stash locations and that he had instructed Hill's minor child to take a backpack full of cocaine to get rid of it.  He said he told the child to jump the gate and throw it away.  While executing a search warrant at the stash location, law enforcement encountered a three-year-old child emerging from the back door with a backpack which they found contained large amounts of cocaine.  Inside the residence, agents found another backpack containing bulk cocaine and two more guns.  The total amount of cocaine seized during the March 30, 2024 search was more than 4.1 kilograms.

On June 13, 2024, agents intercepted additional calls from McGee's sources of supply about bringing a bulk cocaine load to Mobile for McGee.  That evening, deputies intercepted and arrested McGee in possession of 3 kilograms of cocaine which were sitting in his lap.  They also executed a search warrant at a different stash location and seized an additional 2 kilograms of cocaine and 2 guns including another AK-47 style Draco pistol.

After his arrest and having received the *Miranda* warning, McGee admitted he had been trafficking bulk cocaine for at least seven years with a goal of making $20,000 in profit per month from drug trafficking.  He also lied suggesting that he had sold all the high-end jewelry previously seized and returned.  That same night agents intercepted Maxie and Exavieria calling various co-conspirators to alert them about what had happened.  They then returned to the Raspberry Lane residence to try to clear everything out including the jewelry and gun to store it at Exavieria's place.  However, agents ultimately seized most of the jewelry and gun by searching Exavieria's residence pursuant to a warrant.  Prior to their arrival, Maxie learned of the likely search and

contacted Exavieria's minor son to direct him to locate the gun and toss it from a balcony before law enforcement could find it.

In her first motion to suppress (Doc. 267), Maxie argues that any conversations between Maxie and McGee should be suppressed due to marital privilege. She argues that there was no evidence to suggest that she participated in any joint criminal activity with her husband or agree to assist him. In her second motion to suppress (Doc. 661), Maxie asserts the same argument though she does get a little more specific. Maxie argues that the affidavit submitted in support of the Title III wiretap application materially misrepresented and omitted key facts about Maxie's involvement in her husband's drug trafficking organization ("DTO") and the alleged fraudulent activity. She also asserts that the affidavit misrepresented the status between McGee and Maxie as romantic partners and cohabitants instead of a married couple who were then separated. She argues that the United States did not minimize and intruded upon privileged and confidential marital communications. Maxie further argues that that she was not involved in McGee's DTO and the affidavits falsely paint a picture of her as a target and co-conspirator. Maxie asserts that she owned and operated several legitimate businesses and that she and McGee did not share a life together. They simply maintained a relationship for the sake of their children. Next, Maxie includes in the title of the motion to also suppress items obtained during the December 2022 search warrant of her home. She glosses over whatever argument she intended to make as she only references the December 2022 search in limited fashion. Specifically, she references that agents applied for a search warrant of her home and argues that the affiant knew or should have known that McGee did not live at Maxie's address and that it should not have been issued and McGee and Maxie were separated. So as a result, she believes the December 2022 search warrant should have never issued. Finally, Maxie challenges the necessity of the wiretap and argues that the agents

should have stopped the CCTV device in the Cadillac Escalade after McGee was arrested on June 13, 2024.

With regard to the first motion to suppress, the United States filed its response on January 27, 2025. *See* Doc. 278. The United States incorporated by reference the background of the investigation from an earlier filed motion to revoke release order (Doc. 110, filed 8/5/24). The United States argues that the burden remains with the defendant claiming marital privilege. Further, the United States argues that the partnership in crime exception applies to marital privilege and that it is clear that McGee and Maxie fit within that exception. *See* Doc. 278. In response to the later filed similar motion to suppress, the United States filed its omnibus response on November 6, 2025.[6] *See* Doc. 683. In that response, they reiterate that Maxie's motion largely relies upon Maxie's own self-serving and conclusory statements that she is not guilty and had nothing to do with McGee's DTO. The United States also notes the search warrant for the December 2022 search of the home at Raspberry Lane was well-supported. The United States also asserts the wiretap applications were well supported and that Maxie has not met the threshold to show falsity or misleading of Judge DuBose. Finaly, the United States argues that Maxie's suggestion that agents should have stopped the CCTV in the Cadillac Escalade fails because the wiretap was tied to the facility and not a particular person.

Though not required as discussed below, the Court heard Maxie's first motion to suppress on February 4, 2025. Later, after a mistrial and a "reset" of the case after misconduct committed by McGee's counsel, the Court allowed for new motions and held a second hearing on December

---

[6] The omnibus response also relates to several other motions (Docs. 654, 655, and 662). The Court previously gave oral rulings and articulated its reasoning for each on the record. *See* Docs. 729, 730, and 732). This opinion need not address those motions, but the Court notes it here since the omnibus response includes it.

1, 2025.  This hearing included any arguments made as they related to Maxie's motion to suppress.

## II.    LAW AND DISCUSSION

### A.    Need for a Hearing

The United States Supreme Court determined "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause the Fourth Amendment requires that a hearing be held at the defendant's request."  *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

Maxie makes generalized assertions of falsity, misleading statements, or omissions from the affidavit, but she makes no specific allegations against any agent.  She mostly makes self-serving arguments about her marital status with McGee being separated (and therefore not living with her) and then also about her innocence of any involvement in McGee's DTO.

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  *Id*. at 171-72; *see also United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001) (quoting *Franks* and applying its analysis when evaluating an affidavit offered in support of a wiretap order).  The Court agrees with the government that without a specific allegation of false statements or material omissions by government agents supported by an offer of proof, a hearing is not necessary to determine the necessity issue.  Neither McGee nor Maxie make such specific assertions accompanying by an offer of proof.  However, while the law does not mandate a hearing, there is nothing which precludes the Court from holding one.  As such, out of abundance of caution and given the lengthy sentences these defendants faced if

convicted, the Court elected to hold a hearing.

**B.      Standing**[7]

It is well established that for a defendant to move to suppress evidence, she must have standing. *United States v. Eyster*, 948 F.2d 1196, 1208-09 (11th Cir. 1991).  A defendant has the burden of showing standing under the Fourth Amendment.  *See United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997) (citing *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984)). To claim the protection of the Fourth Amendment, an individual must have a "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (citing *Katz v. United States*, 389 U.S. 347, 353 (1967)); *see also Brazel*, 102 F.3d at 1147 ("To have standing, a defendant bears the burden of showing a legitimate expectation of privacy in the area searched.").  "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (citations and internal quotation marks omitted). That said, "[s]tanding does not require an ownership interest in the invaded area." *United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011) (noting that the Supreme Court has recognized that an overnight guest in a home has a legitimate expectation of

---

[7] Standing in this context is different than the traditional use of the word standing as it relates to the Article III case-and-controversy requirement.  The Article III context presents a "threshold *jurisdictional* question which must be addressed prior to an independent of the merits of a party's claims."  *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (quoting *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1359 (11th Cir. 2007) (emphasis added).  Whereas, in the context of a Fourth Amendment suppression challenge, "[t]his threshold issue—whether an individual has a reasonable expectation of privacy in the object of the challenged search—has come to be known colloquially (but as it turns out misleadingly) as Fourth Amendment 'standing.'" *Ross*, 963 F.3d at 1062.

privacy in that home).

An individual has standing to challenge a search if "(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (citing *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006)).  Courts assess on a case-by-case basis the standing of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control.  *Oliver v. United States*, 466 U.S. 170, 191 n. 13 (1984). Moreover, the Eleventh Circuit has held that where a defendant is neither the owner nor the lessee of the place searched, in order to contest a search, he must "demonstrate a significant and current interest in the property at the time it was searched."  *United States v. Miller*, 387 F. App'x 949, 951 (11th Cir. 2010) (citation and internal quotation marks omitted);[8] *see also Harris*, 526 F.3d at 1338 (quoting *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983)) ("A legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy.").

Standing in the context of a wire communication is coextensive with standing under the Fourth Amendment.  *Alderman v. United States*, 394 U.S. 165, 176 n. 9 (1969); *United States v. Brazel*, 102 F.3d 1120 (11th Cir. 1997).  To challenge an order permitting the interception of communications, a defendant must establish that he was an "aggrieved person." *See* 18 U.S.C. § 2518(10)(a).  An "'aggrieved person' means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18

---

[8] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

U.S.C. § 2510(11).  The statute permits an "aggrieved person" to move to suppress the contents of any wire or oral communication intercepted.  18 U.S.C. § 2518(10)(a).  In other words, a defendant has standing only in those communications in which they were a participant or occurred on his premises. *United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975).  Standing is not conferred on co-conspirators or co-defendants who are not parties to or targets of the intercepted communications merely because they are ultimately implicated by evidence obtained during the surveillance.  *United States v. Fredericks*, 586 F.2d 470, 480 (5th Cir. 1978).[9]

To have standing, a defendant must show "(1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises." *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006).  While the defendants only have standing as to the conversations in which they were captured, if they were a target, or those that occurred on their respective premises, that obviously gives rise to their ability to challenge the Government's need to obtain the wiretap order that is subject to this motion.

Maxie fails to address standing in her motion.  But the Court finds she does have standing as to the conversations captured that involve her.  Moreover, to the extent they occur in the Cadillac Escalade, the Court believes that would likely constitute a premises which would satisfy the third prong of "the interception took place on [her] premises."  To the extent there are calls that occurred in the Cadillac Escalade, the Court will assume Maxie has standing as the registered owner.

### C.      Wiretap Authorizations

A court's wiretap order issued pursuant to Title III enjoys a presumption of validity. *United States v. Weber*, 808 F.2d 1422, 1423 (11th Cir. 1987).  Therefore, the Defendants bear the

---

[9] The Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

burden of overcoming this presumption of validity.  *See United States v. De La Fuente*, 548 F.2d 528, 534 (5th Cir. 1977); *accord Weber*, 808 F.2d at 1424 (citing *De La Fuente* and the presumption of validity).

Pursuant to 18 U.S.C. § 2518(1)(c), an application for an order authorizing a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  "Based on the application, the district court may grant an ex parte order if it determines that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . ."  *United States v. Hyppolite*, 609 F. App'x 597, 606 (11th Cir. 2015) (quoting *United States v. Alonso*, 740 F.2d 862, 867-68 (11th Cir. 1984)).  "The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed."  *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986); *see also United States v. Harrell*, 635 F. App'x 682, 684-85 (11th Cir. 2015) (quoting *Van Horn*).  The affidavit need not demonstrate that the police exhausted every conceivable technique before applying for a wiretap.  *Alonso*. 740 F.2d at 868.  Nor does the statute intend "to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques."  *Id.* (quoting *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978)).  Partial success by other alternative investigative measures does not render electronic surveillance unnecessary and it can still be used if the government can "show why alternative measures are inadequate for 'this particular investigation.'"  *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) (quoting *United States v. Carranzana*, 921 F.2d 1557, 1565 (11th Cir. 1991)).  Put simply, the application must show a substantial

investigative need.

In the instant affidavits, each contains elaborate and detailed accounts of law enforcement's techniques which have met (or would have likely met) with limited success and failure. The investigation had met with limited success in some areas such as controlled purchases of cocaine, the use of confidential informants, and several other warrants procured from both state and federal judges including the search of the Raspberry Lane residence (which resulted in finding evidence related to both drugs and financial fraud), pole cameras, pen registers/toll analysis, and physical surveillance. However, even with this evidence, they had not adequately determined the size and scope of the potential criminal conspiracy. In addition, the agent set out in great detail why other law enforcement techniques were inadequate to address the stated goals of ferreting out all the participants in the narcotics conspiracy.

The gist of Maxie's arguments is (1) marital privilege applies to the communications between her and McGee, (2) a lack of probable cause for the issuance of the wiretap authorization, and (3) no necessity for the wiretap authorization.

From the outset, the Court notes that a wiretap application is one of the instances when *ex parte* communications are permissible. Additionally, the Court need not recite in detail all the contents of the affidavits – the record speaks for itself. It is clear that Agent Rulong and other law enforcement officers had conducted a significant and thorough investigation before seeking the wiretap authorizations. The United States provided affidavits that gave extensive details about investigative techniques that were utilized – the success and limitations of both and also detail why other techniques would either fail or meet with limited success. There is no question in the Court's mind that there was more than adequate probable cause for Judge DuBose to grant the authorizations and that necessity was demonstrated.

Page 13 of 21

Maxie spends limited time on probable cause as it relates to the wiretap and seems instead to embed her arguments about the December 2022 search warrant for the Raspberry Lane home. Maxie seems to argue that but for the Raspberry Lane search, the wire authorization would not have occurred. She also argues that she and McGee were separated and McGee no longer resided there and had his own place. This ignores the mountain of other evidence that was included in the affidavits presented to Judge DuBose. Maxie attempts to plead blissful ignorance as to her husband's criminal activities, but the evidence presented in the affidavit and at the hearing clearly establish otherwise.

As to necessity. the evidence indicates none of the law enforcement techniques short of a wiretap would have enabled law enforcement to establish the clandestine and illegal relationship between the defendants. The very nature of a criminal conspiracy makes it difficult to determine relationships between the defendants and even identification of all relevant subjects. The Court finds that the agent adequately articulated the reasons why other investigative techniques would not find the success needed to penetrate this particular drug related conspiracy. The Court further finds law enforcement considered other techniques under the appropriate standard and logically concluded they were inadequate or likely to fail. Further, despite Maxie's arguments to the contrary, "the partial success of alternative investigative measures…does not necessarily render electronic surveillance unnecessary." *Perez*, 661 F.3d at 581-82 (citing *United States v. Fernandez*, 388 F.3d 1199, 1236-37 (9th Cir. 2004) (concluding that the Government met the necessity requirement despite two confidential informants providing significant information)); *see also United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 n. 7 (11th Cir. 2010) (necessity requirement was met despite Government's use of confidential informants and consensual monitoring). Traditional techniques short of the wiretap would not have produced the same results.

Page 14 of 21

In addition, the use of traditional techniques short of a wiretap would have posed a greater danger to law enforcement, defendants, and other involved parties (including minors).  Informants were used with some success to make controlled purchases of narcotics from several investigative targets – but were still limited given the very nature of a drug conspiracy.  Further, pen registers and toll record analysis would not reveal sufficient information regarding the scope and individuals of the conspiracy.  Up to this point, despite having tried several investigatory tools, law enforcement was unable to identify the full scope and membership of the drug trafficking organization.  Judge DuBose found the affidavits on their face more than demonstrated the need to employ a wiretap and therefore satisfied the Title III necessity requirement.  This Court agrees.

The Court will now address the discussion marital privilege and minimization as they touch on the same conversations between McGee and Maxie as well as those conversations Maxie had after McGee was arrested.

There are two types of marital privilege: the marital confidential communications privilege and the spousal testimonial privilege.  *United States v. Singleton*, 260 F.3d 1295, 1297 (11th Cir. 2001) (citing *Trammel v. United States*, 445 U.S. 40-, 50-51 (1980)).  In her motion, Maxie implicates the marital communications privilege.  The marital communications privilege generally "excludes information privately disclosed between husband and wife in the confidence of the marital relationship." *United States v. Abram*, 171 F. App'x 304, 310 (11th Cir. 2006) (citing *Trammel*, 445 U.S. at 51); *see also United States v. Lewis*, 2024 U.S. App. LEXIS 16803, at *15-16 (11th Cir. July 10, 2024) (It is well established that the marital-communications privilege prevents the disclosure of private communications between spouses in the confidence of the marital relationship.").  However, there are many exceptions to the privilege.

"[T]he privilege does not apply to communications made in the presence of third parties,

and generally applies only to utterances, not acts." *Harrison v. United States*, 577 F. App'x 911, 913 (11th Cir. 2014) (citing *Pereira v. United States*, 347 U.S. 1, 6 (1954)). "It also does not apply to conversations between husband and wife about crimes in which they are jointly participating." *Abram*, 171 F. App'x at 310 (citing *United States v. Entrekin*, 624 F.2d 597, 598 (5th Cir. 1980)); *see also United States v. Malekzadeh*, 855 F.2d 1492, 1496 (11th Cir. 1988) ("the marital privilege does not protect those conversations made in furtherance of a conspiracy."); *United States v. Mendoza*, 574 F.2d 1373, 1381 (5th Cir. 1978) ("[C]onversations between husband and wife about crimes in which they are jointly participating when the conversations occur are not marital communications for the purpose of the marital privilege, and thus do not fall within the privilege's protection of confidential marital communications.").

For these exceptions alone, Maxie's arguments about marital communications privilege fails. The evidence even before trial well establishes Maxie played a significant role in McGee's DTO and therefore she was a co-conspirator and active participant. This alone eviscerates the privilege. There was significant evidence presented at the hearing and in the trial which established Maxie's role in both the DTO and the financial fraud. Indeed, she ultimately pled guilty to the financial fraud despite her subsequent attempts to walk back the plea.

However, there is an additional exception to the marital communications privilege that Maxie herself implicates but is not discussed by either her or the United States. The Eleventh Circuit has also recognized that "the privilege is not available when the parties are permanently separated; that is, living separately with no reasonable expectation of reconciliation." *Singleton*, 260 F.3d at 1300. Maxie's own motion repeatedly emphasizes that she and McGee were separated and that she had no knowledge of what he did or did not do. While the evidence presented at the hearing and at trial ultimately belies that assertion – even taking Maxie at face value would then

mean that the marital privilege would not apply due to the permanent separation in their marriage. Put simply, Maxie cannot have it both ways – yet her claim would fail either way. She cannot argue that she and McGee were separated with her having no knowledge of anything McGee did while also arguing that the marital communications privilege applies. While the Court rests its ruling on the co-conspirator and co-defendant exception to the marital privilege, it would be remiss to avoid any discussion about Maxie's reliance upon a privilege that would not even exist _if_ she were accurately reciting the facts about their separation.[10]  Regardless, as shown by the evidence presented at the hearing and subsequent trial (with its accompanying conviction), it is clear the privilege did not apply as Maxie was not an innocent party, but rather an active co-conspirator in both the DTO and the financial fraud.

This also answers the subsequent question about minimization raised by Maxie. As it was clear from the evidence that Maxie was an active participant in more than one criminal conspiracy, even though the wire and CCTV targeted McGee, there was no requirement for the United States to minimize conversations involving Maxie – whether with McGee or otherwise.

"The minimization standard applies a test of reasonableness to the peculiar facts of each case. Three factors are considered in deciding whether attempts to minimize were reasonable: (1) The nature and scope of the criminal enterprise under investigation; (2) The Government's reasonable inference of the character of a conversation from the parties to it; and (3) The extent of judicial supervision." _United States v. Hyde_, 574 F.2d 856, 869 (5th Cir. 1978) (citations omitted).

---

[10] The Court chooses not to delve into the three factors about determining a permanent separation since the Court is relying upon the co-conspirator exception. _See Singleton_, 260 F.3d at 1302 (reciting 3 objective factors: "(1) Was the couple cohabitating?; (2) if they were not cohabitating, how long had they been living apart?; and (3) had either spouse filed for divorce?" And further holding that a court may also consider other objective evidence of the parties' intent or lack of intent to reconcile or testimony by the spouses themselves regarding their subjective intent.)

When agents are investigating a widespread conspiracy (or in this case conspiracies plural), it is appropriate to monitor calls more extensively than in a simpler case.

Under the circumstances here, the Court finds no error in the minimization efforts of the agents. It is clear from the evidence that the recordings of which Maxie complains are not innocent conversations but fall squarely in the heart of the conspiracies at issue. The nature and scope of both the DTO and the financial fraud conspiracies were vast. Maxie was an active participant. None of the subject calls identified by Maxie should be suppressed for failure to minimize.

Based on the above, Maxie's motion to suppress the wire fails and is denied.

**D.     Search at Raspberry Lane**

To the extent Maxie challenges the December 2022 search at the Raspberry Lane residence, the motion likewise fails. It is unclear as to exactly what Maxie's challenge is here because she buries the argument in the context of the wiretap application, but she seeks full suppression of the evidence from the December 2022 search in the conclusion of her motion.

Maxie states that she and McGee were separated and that she and her children lived at the Raspberry Lane address while McGee lived elsewhere. First, the Court notes that no evidence was submitted with the motion or at the evidentiary hearing to support that assertion. While the evidence did establish that McGee owned multiple properties, the evidence did not establish that McGee did not still reside and utilize the Raspberry Lane address. Further, the evidence did establish probable cause McGee and Maxie used the address extensively as part of the financial fraud and DTO conspiracies.

As noted, on December 19, 2022, FBI Special Agent Joseph Simmons applied for a warrant to search McGee's house and any vehicles located at his residence at 2471 Raspberry Lane. *See* Doc. 371-1. The Magistrate Judge reviewed and issued the warrant on the same day. *Id*. To

obtain the search warrant, Agent Simmons submitted a 45-page affidavit outlining the details of an investigation in which the FBI intercepted conversations between McGee, John Clarke, and others. Clarke was the target of a separate Title III wiretap and was under investigation for conspiracy to distribute bulk cocaine and a massive tax-fraud scheme dating back to 2020. Based on bank and phone subscriber records, tax records, information from cooperating defendants, wiretapped phone calls, and other evidence outlined in SA Simmons's lengthy affidavit, the Magistrate Judge approved the search warrant. *Id*. Nothing in Maxie's motion seems to challenge any of that *except* her unsupported statements that they were separated, and he did not live there. Maxie presented no <u>evidence</u> to support those assertions – only her unsupported statements in the motion. Further, the evidence before the Court both before and after trial make it clear that regardless of the marital status, McGee clearly still heavily utilized the Raspberry Lane residence even if he had other properties.

"Total suppression of all items seized, including items within a warrant's scope, is not appropriate unless the executing officers' conduct 'exceeded any reasonable interpretation of the warrant's provisions.'" *United States v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2007) (quoting *Wuagneux*, 683 F.2d at 1354). Unless agents display a "'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized." *Id*. (quoting *United States v. Lambert*, 887 F.2d 1568, 1572 (11th Cir. 1989)). Finally, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009).

Put simply, the Court finds Maxie's complaints lack substance. At no point does the Court find that the items were unreasonably seized, outside the scope of the warrant, or not otherwise

Page 19 of 21

supported by probable cause.  In looking at the totality of the circumstances, the agents' conduct was reasonable.  The Court finds no societal purpose in the suppression of the evidence seized and therefore Maxie's motion merits denial.

**E.      Good Faith**

Lastly, even if Judge DuBose erred in the issuance of the wiretap authorization (including the CCTV for the Cadillac Escalade) or the judge erred in the issuance of the search warrant for the December 2022 search at Raspberry Lane, the *Leon* good faith exception to the Exclusionary Rule applies in this case.  *See United States v. Leon*, 468 U.S. 897 (1984).  The *Leon* good faith exception "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *United States v. Robinson*, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (citing *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002)); *see also United States v. Mathis*, 767 F.3d 1264, 1276-77 (11th Cir. 2014) (reiterating principles of *Leon*). The good faith exception also applies to wiretap applications and orders.  *See Malekzadeh*, 855 F.2d at 1497.  There are only four situations where the good faith exception does not apply:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient- i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

*Martin*, 397 F.3d at 1313 (citing *Leon*, 468 U.S. at 923).  There is no indication that any of these four situations occurred in this case on any of the warrants at issue.  The only one that is referenced by Maxie is the first one and the Court finds that there was no misleading or false information

presented.  Moreover, Maxie's protestations of innocence are self-serving (and now that the trial is concluded – run afoul of the jury verdict.  There was more than ample probable cause for both the CCTV and the search of the Raspberry Lane residence.

The purpose of the exclusionary rule is to act as "a deterrent to willful conduct that violates individual rights."  *Malekzadeh*, 855 F.2d at 1497. Here, the law enforcement officers did exactly what the law requires.  It is undisputed that an application and affidavit for a wiretap was submitted to a federal district judge who then made a probable cause determination.  Law enforcement sought judicial permission and gave a neutral and detached judicial officer all of the information the judicial officer determined she needed to authorize the interceptions and search authorization. Nothing on its face would demonstrate to a reasonable law enforcement officer that the affidavits were in any way deficient in this or any other regard.  Moreover, despite some vague generalized assertions of falsity or misleading to the judge, there was no evidence presented nor does the record contain evidence that law enforcement was dishonest or reckless in preparing their affidavits and applications.  Consequently, the reliance on the wiretap and search authorizations was appropriate and accordingly, the good faith exception precludes suppression of the evidence.

### III.   CONCLUSION

Accordingly, the motions to suppress (Docs. 267, 661) were and remain **DENIED**.

**DONE** and **ORDERED** this 5th day of August 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE